| | |
|---|---|
| ANGELA MYERS, OSCAR RODRIGUEZ, PAUL SUTTON, TREVOR ADKINS, BRENT RISH, DEREK SAMMELMAN, and MARY MARTIN, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC. and NASCAR DIGITAL MEDIA, LLC, <br><br> Defendants. | **Case No.:** <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Angela Myers, Oscar Rodriguez, Paul Sutton, Trevor Adkins, Brent Rish, Derek Sammelman, and Mary Martin ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against defendants National Association for Stock Car Auto Racing, Inc. ("NASCAR") and NASCAR Digital Media ("NDM") (collectively "NASCAR" or "Defendants"). On the NASCAR website at https://www.nascar.com/ (the "Website"), NASCAR utilized tracking tools created by Facebook, without seeking or obtaining subscribers' consent, which resulted in violation of the Video Privacy Protection Act (VPPA). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all persons who subscribed to the NASCAR Website owned and operated by Defendants.

2.      The Website provides users with access to articles, driver statistics, video content, and more related to the NASCAR racing, including pre-recorded clips of races, race highlights, interviews with drivers and team staff, sports analysts, and more.

3.      As of 2012, NASCAR took direct control over the operations of its Website.

4.      On the Website, Defendants solicit site visitors to subscribe to e-newsletters. The Website's newsletter subscribers are offered email updates regarding NASCAR events, drivers, and content on the Website in exchange for their contact information, as depicted below:



*Figure 1 - The Website newsletter sign-up[1]*

5.      The newsletter email updates that result from subscription to the Website's newsletters include links to the Website, with direct links to articles and pre-recorded videos for subscribers to watch on the Website.

---

[1] *The NASCAR® Newsletter*, NASCAR https://www.nascar.com/newsletters/ (last visited December 20, 2023).

6.      NASCAR, including the video component of its business (*see infra,* Sections C and D(c)), benefits from subscriptions to the Website's newsletter.   The subscriptions to newsletter emails provide NASCAR with a host of benefits, including revenue generation, positive marketing, and driving traffic to the Website.  *See, infra, Section E.*

7.      The Website contains pre-recorded video content. Based on the investigation conducted on behalf of Plaintiffs, NASCAR has produced at least 15,000 videos for the Website.[2] This content is hosted by NASCAR and made available to be requested or watched on the Website by NASCAR. The video content on the site is owned and copyrighted by NASCAR and, in many instances, created by NASCAR itself. In all instances, the web watching of these videos is tracked by NASCAR as a result of its decision to place the Facebook Pixel (referred to as the "Pixel," discussed and defined herein) on each individual page containing its video content on the Website.

8.      Defendants do not disclose that subscribers' personal identifying information ("PII") would be captured by the Pixel  and then transferred to Facebook. The Website does not inform site subscribers or site visitors that their PII will be exposed, available and readily usable by any person of ordinary technical skill who receives that data.  At no point during or after the subscription sign up process – or anywhere on the Website for that matter – do Defendants seek or obtain consent for the sharing of subscribers' PII and web watching history, which NASCAR surreptitiously gathered through the use of the Pixel that it chose to employ on the website.

---

[2] NASCAR's sitemap index contains 16 separate video sitemaps for the website, each containing a list a of video URLs, including the date each webpage containing the video was last modified. Between the 16 video-related sitemaps listed, a total of 15,015 video URLs.  *See XML Sitemap,* NASCAR https://www.nascar.com/sitemap_index.xml  (last visited August 2, 2023).

9. In today's data driven world, a company's data sharing policies for a service or subscription are important factors for individuals to consider in deciding whether to provide personal information to that service or commit to a subscription.

10. Congress has recognized the immediate and irreversible harm caused by associating and disclosing a person's personally identifiable information in conjunction with their video watching.

11. Congress' enactment of the Video Privacy Protection Act ("VPPA"), and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers,[3] such as Defendants, from sharing subscribers' PII tied to the title, description, or subject matter of pre-recorded audio video material[4] (the "Personal Viewing Information" or "PVI") without valid consent.[5]

12. Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

13. On the Website, because of NASCAR'S decision to employ the Pixel and because it chose to employ the Pixel on its video content on the Website, a subscriber's PVI is shared *the moment* the subscriber requests video materials.[6]

14. Defendants purposefully implemented and utilized the Pixel, which tracks user

_____

[3] 18 U.S.C. § 2710(a)(4).
[4] 18 U.S.C. § 2710(b)(2)(D)(II).
[5] 18 U.S.C. § 2710.
[6] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having "*requested* or obtained" video materials. *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user. *See How the Web works*, Mozilla https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited on December 20, 2023).

activity on the Website and discloses that information to Facebook to gather valuable marketing data. The Pixel could not be placed on the Website without steps taken directly by or on behalf of Defendants (*see* Section C(a)). To be clear, the Pixel cannot be placed on a website by Facebook. Only a website owner can place the Pixel on a website. Here, the Pixel was utilized on the NASCAR Website, and effectuates the sharing of subscribers' PVI. None of this could have occurred without purposeful action on the part of Defendants.

15.     Defendants do not seek and has not obtained consent from subscribers to utilize the Pixel to track, share, and exchange their PII and web watching data with Facebook.

16.     When a party, such as NASCAR, utilizes Facebook's Pixel, it is provided with details about its functionality, including the collection and disclosure of its subscribers' PVI.[7] In fact, it is made aware that one of the functions of the Pixel is to collect and share PVI to "use that information to provide measurement services[] [and] target and deliver ads. *Id.*

17.     Facebook also advises and directs website owners that there are notice and consent requirements associated with the use of the pixel in that website owners are responsible to provide that notice and obtain those consents. *See, infra,* ¶ 152.

18.     Not only did NASCAR know that its Website's subscribers' PVI would be shared, it was on notice of its notice and consent obligations.

19.     NASCAR cannot claim surprise as to the nature of the Pixel when Facebook itself warned NASCAR, aside from needing "a clear and prominent notice on each web page where

---

[7] *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage . . . Meta[] may use cookies web beacons and other storage technologies to collect or receive information from your websites . . . .") (last visited on December 20, 2023).

[its] Pixels are used[,]" that NASCAR must "ensure, in a verifiable manner, that an end user provide[d] all necessary consents before [NASCAR] use[d] [Facebook's Pixel] to enable the storage of and access to Meta cookies . . . [i]n jurisdictions that require informed consent." *Id.*; *see, supra,* Section C(d). Employing the Pixel on the Website resulted in users' PVI being shared (resulting in VPPA violations) with third parties. Defendants, despite its use of the Pixel, including on the pages of the Website containing pre-recorded video content, failed to obtain users' consent to allow the Pixel to operate in a way that shares users' protected information with Facebook.

20.     Subscribers of the Website have been harmed as a result of violations of the VPPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Website, or (ii) add adequate notices, and obtain the appropriate consent from, subscribers.[8]

21.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of subscribers of the Website for violations of the VPPA, 18 U.S.C. 2710.

---

[8] Website owners like NASCAR also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook. *See Meta for Developers: Advanced Matching*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching#security (last visited December 20, 2023); *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission") (last visited on December 20, 2023).

## PARTIES

22.    Plaintiff Angela Myers is a resident of Lakeland, Florida. Plaintiff Myers signed up for a NASCAR newsletter on or about 2022. Plaintiff Myers became a subscriber to the NASCAR newsletter by providing her personal information, including, her name, email address, IP address (which informs Defendants as to the city and zip code she resides in as well as his physical location), and any cookies associated with her device. Plaintiff Myers used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Myers through the Website. Plaintiff Myers used a Chrome internet browser on her laptop computer and other devices to view Defendants' video content, such as videos with NASCAR race highlights, racer interviews, and other video content. Plaintiff Myers cannot recall the names or titles of specific video content she viewed on the NASCAR website. Plaintiff Myers opened her Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff Myer's browser remained signed into her Facebook account when accessing and viewing video content on the Website. Plaintiff Myers did not consent, agree, authorize, or otherwise permit Defendants to disclose her PVI to Facebook. Plaintiff Myers was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Myers PVI to Facebook. During the course of Plaintiff Myers' subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Myers' right to privacy under the VPPA.

23.    Plaintiff Oscar Rodriguez is a resident of Port Orange, Florida. Plaintiff Rodriguez signed up for a NASCAR newsletter on or about 2022. Plaintiff Rodriguez became a subscriber to

the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendants as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Rodriguez used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Rodriguez through the Website. Plaintiff Rodriguez used a Chrome internet browser on his laptop computer and other devices to view Defendants' video content, such as videos related to NASCAR including highlight videos on the 2023 Daytona 500 and Sanoma NASCAR races, among other video content. Plaintiff Rodriguez opened his Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff Rodriguez's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Rodriguez did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Rodriguez was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Rodriguez's PVI to Facebook. During the course of Plaintiff Rodriguez's subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Rodriguez's right to privacy under the VPPA.

24.     Plaintiff Paul Sutton is a resident of Concord, North Carolina.  Plaintiff Sutton signed up for a NASCAR newsletter on or about 2015. Plaintiff Sutton became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendants as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Sutton used the Website

for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Sutton through the Website. Plaintiff Sutton used a Chrome internet browser on his laptop computer and other devices to view Defendants' video content, such as videos related to NASCAR including highlight videos and specifically a video titled "Josh Berry to drive No. 4 Ford for Steward-Haas Racing in 2024," along with other video content. Plaintiff Sutton opened his Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff Sutton's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Sutton did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Sutton was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Sutton's PVI to Facebook. During the course of Plaintiff Sutton's subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Sutton's right to privacy under the VPPA.

25.     Plaintiff Trevor Adkins is a resident of Bowling Green, Kentucky. Plaintiff Adkins signed up for a NASCAR newsletter on or about 2021. Plaintiff Adkins became a subscriber to the NASCAR newsletter by providing his personal information, including his name, email address, IP address (which informs Defendants as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Adkins used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Adkins through the Website. Plaintiff Adkins used a Chrome internet browser on his laptop computer and other devices to view Defendants' video content, specifically Plaintiff Adkins recalls

watching a video regarding an on-track dispute between Kyle Larson and Dany Hamlin and highlights of the 2023 Pocono NASCAR race on the NASCAR Website, among other video content. Plaintiff Adkins opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Adkins' browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Adkins did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Adkins was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Emmons' PVI to Facebook. During the course of Plaintiff Adkins' subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Adkins' right to privacy under the VPPA.

26.     Plaintiff Brent Rish is a resident of Hubbardston, Massachusetts.  Plaintiff Rish signed up for a NASCAR newsletter on or about 2017. Plaintiff Rish became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendants as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Rish used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Rish through the Website. Plaintiff Rish used a Chrome internet browser on his laptop computer and other devices to view Defendants' video content, such as highlights and recaps on the Pocono race of 2023 on the NASCAR Website, among other video content. Plaintiff Rish opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Rish's browser remained signed into his Facebook account when accessing

and viewing video content on the Website. Plaintiff Rish did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Rish was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Rish's PVI to Facebook. During the course of Plaintiff Rish's subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Rish's right to privacy under the VPPA.

27. Plaintiff Derek Sammelman is a resident of Wentzville, Missouri. Plaintiff Sammelman signed up for a NASCAR newsletter on or about 2019. Plaintiff Sammelman became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendants as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Sammelman used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Sammelman through the Website. Plaintiff Sammelman used a Safari internet browser on his laptop computer and other devices to view Defendants' video content, specifically highlights of the Talladega Superspeedway race and the Kansas Speedway 2023 races, among other video content. Plaintiff Sammelman opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Sammelman's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Sammelman did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Sammelman was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the

disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Sammelman's PVI to Facebook. During the course of Plaintiff Sammelman's subscription to the newsletter, which included links to content on the Website, Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Sammelman's right to privacy under the VPPA.

28. Plaintiff Mary Martin is a resident of Fresno, California. Plaintiff Martin signed up for a NASCAR newsletter on or about 2008. Plaintiff Martin became a subscriber to the NASCAR newsletter by providing her personal information, including, her name, email address, IP address (which informs Defendants as to the city and zip code she resides in as well as his physical location), and any cookies associated with her device. Plaintiff Martin used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Martin through the Website. Plaintiff Martin used a Safari internet browser on her laptop computer and other devices to view Defendants' video content, including NASCAR race highlights and racer interviews among other video content. Plaintiff Martin cannot recall the names or titles of specific video content she viewed on the NASCAR Website. Plaintiff Martin opened her Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Martin browser remained signed into her Facebook account when accessing and viewing video content on the Website. Plaintiff Martin did not consent, agree, authorize, or otherwise permit Defendants to disclose his PVI to Facebook. Plaintiff Martin was not provided with written notice that Defendants disclose their subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Martin's PVI to Facebook. During the course of Plaintiff Martin's subscription to the newsletter, which included links to content on the Website,

Defendants collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendants have violated Plaintiff Martin's right to privacy under the VPPA.

29.     Defendant NASCAR is an American auto racing sanctioning and operating company with headquarters at 1 Daytona Blvd, Daytona Beach, Florida 32114. NASCAR is considered one of the top ranked motorsport organizations globally, and is one of the top spectator sports in the United States. NASCAR oversees various racing series, including the NASCAR Cup Series, where drivers compete for the season-long championship. With a rich history and iconic race events, NASCAR is a driving force in motorsport racing industry.

30.     Defendant NASCAR Digital Media, LLC (NDM) was formed in Florida and is headquartered in North Carolina, with NASCAR Media Group, LLC as a member. NDM manages NASCAR's digital presence through websites, mobile apps, the official NASCAR YouTube channel, and the official fantasy league.[9]

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

32.     This Court has personal jurisdiction over Defendants because Defendant NASCAR Digital Media, LLC's principal place of business is in North Carolina, and Defendants

---

[9] *NDM Advertising Footer*, NASCAR https://www.nascar.com/wp-content/uploads/sites/7/2020/01/2020-NDM-Advertising_Footer-Doc.pdf (last visited December 202023).

derive revenue from its business operations, advertising, sales, etc. that occur in the State of North Carolina.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant NASCAR Digital Media, LLC's principal place of business is located in this District and Defendants conduct substantial business operations in this District. In connection with the Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

## COMMON FACTUAL ALLEGATIONS

### A.    Background of the Video Privacy Protection Act

34.     The "VPPA" prohibits video tape service providers from knowingly disclosing personally identifiable information concerning any consumer of such provider. 18 U.S.C. § 2710(b)(1).

35.     "The Video Privacy Protection Act follows a long line of statutes passed by the congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599 at 2 (1988).  Beginning with the Fair Credit Reporting Act of 1970, Congress sought to protect the "confidentiality of personal information" and passed multiple laws that "expanded and [gave] meaning to the right of privacy." *Id.*

36.     In 1977, Congress amended the Privacy Act and created the Privacy Protection Study Commission ("the Commission"), which studied "'data banks, automated data processing programs, and information systems of governmental, regional, and private organizations, in order to determine the standards and procedures in force for the protection of personal information." *Id.* (quoting 95-38).  The Commission concluded that an effective national information policy must: (i) minimize intrusiveness; (ii) maximize fairness; and (iii) create legitimate, enforceable

expectations of confidentiality. *Id.* "As a general rule, the Commission recommended that organizations which maintained a confidential records system be placed under a legal duty not to disclose the record without the consent of the individual, except in certain limited circumstances. . . ." *Id.* at 2-3.

37.    In 1988, Congress took further action in response to a Washington-based newspaper's publication of profile of Judge Robert H. Bork "based on the titles of 146 films his family had rented from a video store." *Id.* at 5.  Senators took to the floor to denounce the act, with Senator Patrick Leahy noting that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we have to guard against.

*Id.* at 5-6.

38.    Congress believed that these "information pools" created privacy interests that directly affected the ability of people to freely express their opinions, join in association with others, or enjoy the general freedoms and independence protected by the Constitution. *Id.* at 7.

39.    As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

40.    Senator Simon observed that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6-7.

41.     Senate Bill 2361 was drafted to enforce these protections and "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

42.     Congress cited Supreme Court precedent recognizing a privacy right in the lists that reveal personal beliefs and an individual's choice of books and films. *Id.* at 4. Congress asserted that "[p]rotecting an individual's choice of books and films is a . . . pillar of intellectual freedom under the first amendment." *Id.*

43.     The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements regarding obtaining consumers' consent prior to such disclosure. Indeed, Congress has noted that "consent must be obtained from the consumer each time the provider wishes to disclose that information" S. Rep. 112-258, at 2.

44.     Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

45.     The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions." *Id.* at 8.

46.     "Consumer" is defined under the VPPA as "any renter, purchaser, or subscriber of *goods or services* from a video tape service provider." 18 U.S.C § 2710(a)(1) (emphasis added).

47.     "Personally identifiable information" (PII) is defined under the VPPA as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). Congress noted:

> The definition of personally identifiable information includes the term "video" to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would

be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products. **This definition makes clear that personally identifiable information is intended to be transaction-oriented. It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider.** The bill does not restrict the disclosure of information other than personally identifiable information.

Senate Report 100-599, at 12 (1988)

48.     Congress sought to ensure that transactions between a consumer and VTSP involving a request or procurement of specific video materials or video services would be protected. The statute's language encompasses both digital and physical transactions.

49.     "Video tape service provider" ("VTSP") is defined under the VPPA as "any person, ***engaged in the business***, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added).

50.     The word "consumer" is not limited to the purchase or rental of, or subscription to, direct video consumption by the VPPA. While the VPPA does note that the VTSP must be "engaged in the business of" providing "audio visual materials," and that protected PII must concern requests for "video materials," the VPPA *does not* say that a VTSP must be "solely engaged in the business of" providing audio visual materials, nor that a consumer must rent, buy or take delivery of audio visual materials.

51.     The VPPA does not limit the protection of PII to "consumers" who consumed video services (18 U.S.C § 2710(b)(1)); rather, the VPPA affords protection of the PII "concerning any consumer of such provider."

52.     Any limitations on the applicability of the VPPA are focused on the type of providers covered by the statute (VTSPs) and the type of transaction which results in the disclosure of information (PII). The statute does not focus on limiting the scope of consumers; rather, the

statute states that purchasing, renting, or subscribing to goods and services represents the various means through which one can consume goods. The statute's language does not speak to what goods or services were purchased or subscribed to, and more certainly does not limit the purchasing or subscribership to audio or visual content.

53.    Congress could have, but chose not to, define "consumer" as "any renter, purchaser, or subscriber of *audio-visual* goods or services from a video tape service provider." Congress did not, however, include this requirement or limitation to the VPPA's definitions – including the definition of "consumer" – when the VPPA was enacted in 1988. What's more, Congress did not add such language to the VPPA when it was amended in 2012. The statutory construction of the VPPA does not, by its plain language, connect or correlate the goods or services Plaintiffs must purchase, rent, or subscribe to with video materials exclusively. Goods or services and video materials or services are not tied to each other under the statute. *See Buechler v. Gannett Co.*, 2023 U.S. Dist. LEXIS 176817, at *5 (Oct. 2, 2023).

54.    One possible connection between the definitions of "consumer" and "video tape service provider" can be seen through an effort to tie or align the terms used in the definitions of "consumer" and "video tape service provider" as depicted here:

## Consumer – 18 U.S.C. 2710(a)(1)

any renter, purchaser, or subscriber of goods or services from a video tape service provider

## Video Tape Service Provider – 18 U.S.C. 2710(a)(4)

any person, engaged in the business . . . of rental, sale, or delivery of prerecorded . . . audio visual materials

*Figure 2 - Statutory comparison of VPPA-defined terms "consumer" and "video tape service provider"*

55. Carrying this pairing through the end of the sentence, the term "subscriber" is coupled with "delivery."

56. Under such a construction, a VPPA-defined "consumer" would include any person who received delivery of video as a "subscriber of goods or services from a video tape service provider[.]"

57. In 2012, Congress amended the VPPA. In so doing, Congress reiterated the VPPA's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

58. During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[10]

59. Defendants here are video tape service providers. The Defendants provided the website architecture, media hosting, and media player solutions to provide thousands of pre-recorded videos to Plaintiffs and Class members on the Website.

60. Plaintiffs are consumers under the VPPA. Plaintiffs were told that they would receive exclusive and restricted content through their newsletter signup, including news and

---

[10] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited December 20, 2023).

videos. Plaintiffs exchanged personal information for subscriptions to Defendants, which resulted in the creation of an account on the Website. In exchange for their subscription registrations, Plaintiffs received exclusive, scheduled newsletters by email which led Plaintiffs to the Website and the resulting VPPA violations.

61.     The relationship between Plaintiffs and Defendants is contemplated by, and covered by, the VPPA.

**B.     <u>How Websites (and the Internet) Operate</u>**

62.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers, but websites "run" on a user's internet browser.

63.     Websites are a collection of webpages, and each webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[11]

64.     Webpages each have a unique address, and two webpages cannot be stored at the same address.[12]

65.     To conduct communications between a user's PC and a website, the communication's data being transmitted (via "HTTP Request") between the parties is broken apart into chunks called "packets."[13]

---

[11] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited December 20, 2023).
[12] *Id.*
[13] *Packet*, MOZILLA https://developer.mozilla.org/en-US/docs/Glossary/Packet (last visited December 20, 2023).

66.     These packets contain two types of information: (1) user data and (2) control information.[14]

67.     While control information is used to identify where to deliver the user data (also known as the "payload"), the user data itself consists of the "message" or "content" being transmitted to the receiving party.[15]

68.     An "HTTP Request" goes through a process called "transfer encoding," which determines the best way to break down the user data and control information into packets before being sent to a specific URL.[16]

69.     To illustrate this process further, when a user navigates to a webpage, by either entering a URL address directly or clicking a hyperlink containing the address, the browser contacts the DNS server, which translates the web address of that website into an IP address.[17]

70.     An IP (Internet Protocol) address is "a unique address that identifies a device on the internet . . . ."[18] An IP address is:

> …the identifier that allows information to be sent between devices on a network:
> they contain location information and make devices accessible for communication.
> The internet needs a way to differentiate between different computers, routers, and
> websites. IP addresses provide a way of doing so and form an essential part of how
> the internet works.[19]

---

[14] *Id.*

[15] *Id.*

[16]     *See Transfer-Encoding,* MOZILLA        https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/Transfer-Encoding (last visited December 20, 2023).

[17]     *How the web works,* MOZILLA        https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited December 20, 2023).

[18]     *What is an IP Address – Definition and Explanation,* KASPERSKY https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address        (last visited December 20, 2023).

[19] *Id.*

71.     The subscriber's browser then sends an HTTP Request, in the form of packets, to the server hosting that IP address via specific Request URL, requesting a copy of the webpage data for that Request URL be sent to the user.  It is at this stage of the communication that Plaintiffs' *Figures 5, 6, 7, 10, 12, and 13* have been captured through the use of an internet browser's developer console (a built-in tool used by web developers to monitor network traffic and HTML code).  That is to say*, Plaintiffs' Figures 5, 6, 7*, *10*, *12, and 13* only show the network traffic after it has been broken down into packets and is not representative of how the data was received or appeared when being manipulated by Meta.

72.     If the HTTP Request is approved by the recipient, the server sends an HTTP Response that authorizes the HTTP Request and begins the process of sending the webpage's files to the user via packets.[20]

73.     This Request URL includes a domain name and path, which identify the content being accessed on a website and where it is located.

74.     The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 3 - Mozilla's diagram of a URL, highlighting the different elements of a URL and how they appear[21]*

---

[20] *Id.*

[21]     *What     is     a     URL?*,     MOZILLA     https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on December 20, 2023).

75.    The subscriber's browser then assembles the packets back into usable code, which is then processed by the user's browser and "rendered" into a visual display according to the instructions provided by the website.[22]

### C.    NASCAR's Digital Media Background

76.    NASCAR is the sanctioning body for the No. 1 form of motorsports in the United States.[23]

77.    NASCAR consists of three national racing series, four regional series, one local grassroots series, and three international series.[24]

78.    These racing series result in NASCAR sanctioning more than 1,200 races across the United States, Canada, Mexico, and Europe.[25]

79.    As NASCAR's Tim Clark, senior vice president and Chief Digital Officer, notes, not all fans can physically watch a race, "so, specifically on the digital side, we've tried to create a lot of those experience that could be the next best thing."[26]

80.    "Our users really want a race experience on multiple devices.  You know, they really want to see what they see at a race track, and hear what they hear at the race track, and give the fans a great experience on phones, on desktop, and on connected devices.  Obviously,

---

[22] *Id.*
[23] *What is NASCAR? Start Your Engines*, NASCAR Kids https://www.nascarkids.com/what-is-nascar/ (last visited December 20, 2023).
[24] *Id.*
[25] *Id.*
[26] *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion*, Google https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited December 20, 2023).

monetizing across all screens is very important." Brendan Reilly, NASCAR's Director of Revenue Operations.[27]

81.    To monetize these races, among things, NASCAR sells the rights to broadcast races themselves,[28] and created its own digital media operation or venture with, among other digital revenue streams, digital advertising.[29]

82.    To provide content for its digital media presence, NASCAR produces much of its own audio visual media content, under NASCAR Media Group ("NMG") and its various branches.

83.    NASCAR's NMG is a "state-of-the-art production" organization, with media production facilities including recording studios (both audio and visual), data storage and archiving to house NASCAR audio visual content, live and pre-recorded editing suites, and digital distribution infrastructure.[30]

84.    NMG's production team occupies a large portion of NASCAR Plaza in Charlotte, North Carolina, and is scheduled to expand to "a new state-of-the-art facility in Concord" which

---

[27] *Id.*

[28] *See NASCAR looking at streaming option in next media deal; FOX, NBC expected to renew TV rights,* JAYSKI  https://www.jayski.com/2023/05/02/nascar-looking-at-streaming-option-in-next-media-deal-fox-nbc-expected-to-renew-tv-rights/ (last visited December 20, 2023).

[29] *NASCAR Digital Media Adds Five Executives To Team*, SPEEDWAY DIGEST https://speedwaydigest.com/index.php/news/racing-news/5883-nascar-digital-media-adds-five-executives-to-team ("Earlier this year, NASCAR announced that it will assume business and editorial control of its interactive, digital and social media rights including technical operations and infrastructure of all NASCAR digital platforms including NASCAR.com starting in January 2013") (last visited December 20, 2023); *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion*, GOOGLE https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited December 20,, 2023).

[30] *Behind The Scenes Tour NASCAR Racing Media Group Facility*, YOUTUBE https://www.youtube.com/watch?v=WWpmsWOstHI (last visited December 20, 2023).

includes a 58,000-square foot studio and "will house 125 NASCAR Productions and Motor Racing Network employees with room to expand further in the future."[31]

85. This expansion was prompted in part because "NASCAR Productions business has fundamentally changed in recent years, with NASCAR's live event production operation more than doubling since 2018."[32]

86. Brian Herbst, NASCAR's Senior Vice President of Media and Productions said that "live production and investing in technology that enhances the fan viewing experience has never been more important – it's essential that our new workspace can facilitate that strategic growth."[33]

87. A stated purpose of the NMG's "library" is to "preserve and protect the visual and audio history of [the] sport."[34]  And, "[e]very piece of footage that comes into or out of the NASCAR Media Group facility goes through the library."[35]

88. This archived footage is then logged with "metadata" that allows producers to search through and utilize stored video for current media project needs.[36]

89. This digital media is then distributed across multiple channels, such as broadcast and satellites.[37]

90. One such destination for the NMG's digital media is NASCAR's own website.

---

[31] Hank Lee, *NASCAR Productions moving to Concord from Uptown Charlotte*, WCNC Charlotte (Aug. 10, 2022) https://www.wcnc.com/article/sports/motor/nascar/nascar-productions-concord-north-carolina-facility-cabarrus-county-relocation/275-ca5bcb4d-fade-46a8-9401-00d7e3e3a2dd (last visited December 20, 2023).
[32] *Id.*
[33] *Id.*
[34] Hank Lee, *NASCAR Productions moving to Concord from Uptown Charlotte*, WCNC Charlotte (Aug. 10, 2022) https://www.youtube.com/watch?v=WWpmsWOstHI (at 5:25) (last visited December 20, 2023).
[35] *Id.*
[36] *Id.*
[37] *Id.*

91.     In 2012, NASCAR announced that it would handle its NASCAR Website in-house under the management of its subsidiary, NASCAR Digital Media.[38]  To that end, NDM staffed its company with executives that had experience in broadcast, digital media, digital advertising, and video production.[39]

92.     NDM, a Florida LLC which lists NMG as its managing member,[40] is directly linked, through the naming scheme used to identify the videos, to the videos on the Website.[41]

93.     By 2018, NDM was not merely managing and delivering audio visual content to digital platforms, it was also designing connected websites for tracks, racing teams, and NASCAR's own content platform.[42]

**D.      The Website Utilizes the Facebook Pixel to Gather and Transmit PII and Video Watching Data**

94.     Facebook offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

95.     The Pixel is a marketing tool that can only be added to a webpage by website developers.  A website operator must sign up for a business account or link a related Facebook

---

[38] *NASCAR Digital Media Adds Five Executives To Team*, SPEEDWAY DIGEST https://speedwaydigest.com/index.php/news/racing-news/5883-nascar-digital-media-adds-five-executives-to-team (last visited December 20, 2023).
[39] *Id.*
[40] *NASCAR Digital Media, LLC*, SUNBIZ.ORG https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NASCARDIGITALMEDIA%20L110001414860&aggregateId=flal-l11000141486-7839d3cd-5505-40e2-b0ea-99722c824f27&searchTerm=nascar%20digital&listNameOrder=NASCARDIGITALENTERTAINMENT%20A990000012721 (last visited December 20, 2023).
[41] *See XML Sitemap,* NASCAR https://www.nascar.com/sitemap_index.xml (last visited December 20, 2023) (the video sitemaps refer to NDM).
[42] *Inside the Growth of NASCAR Digital Media*, FRONT OFFICE SPORTS https://frontofficesports.com/inside-the-growth-of-nascar-digital-media/ (last visited December 20, 2023).

account with its Pixel, and then add code to the website to make use of the Pixel.[43]

96.     As Facebook notes, the Pixel was added to each individual page that NASCAR wished to be tracked.[44]

97.     Defendants must have effectuated these steps to add the Pixel to the Website.

98.     The Pixel is employed by NASCAR to gather, collect, and then share user information with Facebook.[45]  Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[46]  The sharing of subscribers' PVI benefits NASCAR by improving the effectiveness of advertising targeted at NASCAR's subscribers.  As NASCAR's Brendan Reiley, Director of Revenue Operations, admits, targeted and dynamic digital advertising used across NASCAR's digital platforms increased advertising inventory sales by 90% and increase programmatic fill by at least 300%.[47]

99.     Website owners and operators can choose to use the Pixel to share both user activity (including video watching activity) and user identity with Facebook.  Here, the NASCAR

---

[43] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK, *available at* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on December 20, 2023).

[44] *Meta for Developers: Get Started*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/get-started/ ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions") (last visited on December 20, 2023).

[45] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta for Developers: Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited on December 20, 2023).

[46] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on December 20, 2023).

[47] *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion*, GOOGLE https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited December 20, 2023).

Website shares both.

100.    The harvested data can improve NASCAR's advertising by pinpointing audience demographics by age, gender, relationship status, education, employment title, geographic region, and interests.[48]

101.    The PVI provides similar, if not more, data, including which drivers, racing teams, racing tracks, or racing cups subscribers follow, in addition to their Facebook profile data.

102.    The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, as well as whether or not any of the data within the Pixel transmission should be "hashed" (a form of encryption).

### a.    The NASCAR Website Implemented the Pixel

103.    To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[49]   For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[50]

---

[48]   *How To Target Facebook Ads To "NASCAR" Audience*, ADTARGETING https://adtargeting.io/facebook-ad-targeting/nascar (last visited December 20, 2023).

[49]   *Business Help Center: How to create a Meta Pixel in Business Manager*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on December 20, 2023).

[50]   Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL, https://sproutsocial.com/insights/facebook-business-manager/ (last visited on December 20, 2023).

104.    To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[51]

105.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[52] and must connect the Pixel to a Facebook Ad account.[53]

106.    To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

107.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[54] (v) domain verification, and (vi) configuring web events.[55]

108.    After following these steps, a website operator can start capturing and sharing

---

[51] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YouTube, *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited December 20, 2023).

[52] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, Facebook https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on December 20, 2023).

[53] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, Facebook, https://www.facebook.com/business/help/622772416185967 (last visited on December 20, 2023).

[54] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually. *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YouTube, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on December 20, 2023).

[55] *Business Help Center: How to set up and install a Meta Pixel*, Facebook https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on December 20, 2023); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, YouTube https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on December 20, 2023).

information using the Pixel.

109. A Pixel cannot be placed on a website by a third-party. It must be placed directly by or on behalf of the site owner.

110. Once the Pixel is set and activated, it can begin collecting and sharing user activity data as instructed by the website owner.

111. When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[56]

112. This means that for subscribers to the Website's newsletters who are also Facebook users, their PVI is certain to be shared. Their PII is automatically bundled with their web watching history and disclosed to Facebook when visiting a page with an active Pixel, including the home page.

113. While the process to determine what information is being collected by the Pixel from a user's is admittedly complicated, the recipient of the Pixel's transmissions receives the information in a clear and easy to understand manner.

114. The seemingly complex data, such as the long URLs included in the Pixel's transmission, is "parsed," or translated into an easier to read format, such that the information is legible.

115. For example, an embedded URL in a Pixel HTTP Request may look like an indecipherable code, as depicted below:

[56] *Privacy Center: Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited on December 20, 2023).



*Figure 4 - Sample Pixel Request URL*

116.    However, these URLs are designed to be "parsed" into easy-to-digest pieces of information, as depicted below:



*Figure 5 - Parsed URL Information from Sample Pixel Request*

117.    Similarly, the cookies attached to the Pixel's transmissions appear as a dense, albeit much less so, wall of text, as depicted below:



*Figure 6 - Cookie Data from Sample Pixel Request*

118.    However, like the URL data, the cookie data is easily parsed into more digestible

format, as depicted below:



*Figure 7 - Parsed Cookie Data from Sample Pixel Request*

119.     As such, PVI can be used by anyone who receives the Pixel transmission, to easily identify a Facebook user.

120.     Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### b.     The Pixel as a Tracking Tool

121.     The Pixel tracks user-activity on web pages by monitoring events,[57] which when triggered, causes the Pixel to automatically send data – here, subscribers' PVI – directly to Facebook.[58]

122.     Examples of events utilized by websites include: a user loading a page with (i) "microdata" tags (the "Microdata event"),[59] or (ii) with a Pixel installed (the "PageView event").[60]

---

[57]     *Business     Help     Center:     About     Meta     Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on December 20, 2023).

[58] *See generally Id.*

[59]     *Facebook     Microdata     Installing     Schema*, CAT HOWELL, *available     at* https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on December 20, 2023).

[60]     *Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited on December 20, 2023).

The NASCAR Website utilizes both.[61]

123.    When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[62]  This confirms that the Pixel events sent data to Facebook.

124.    The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie.  It may also include information in its Payload,[63] such as metadata tags.

125.    A Request URL, in addition to a domain name and path, contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 8 – Mozilla's diagram of a URL, including parameters[64]*

### c.  The Pixel Shares and Subscribers' PII and Video Watching Data

126.    Defendants use the Pixel as a tracking method to collect and share Website subscribers' PVI with Facebook. Defendants do not disclose its data sharing practices or obtain permission from its subscribers to share their PVI with Facebook.

---

[61] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See Business Help Center: About the Meta Pixel Helper*, FACEBOOK https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on December 20, 2023).

[62] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on December 20, 2023).

[63] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data.  *See Request Payload Verification,* SITESPECT https://doc.sitespect.com/knowledge/request-payload-trigger (last visited December 20, 2023).

[64] *What is a URL?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on December 20, 2023).

127.     Defendants share non-anonymized, PII and web watching history containing video titles with Facebook. Defendants' disclosures include unique identifiers (the FID) that correspond to specific Facebook users. The recipient of the PVI finds the PII and web watching packaged together in a single data transmission which is easily readable by an ordinary person once the PVI is packaged and delivered by the Website's tracking tools. Defendants monetize their Website's newsletter subscribers by disclosing subscribers' PVI to Facebook in a format which allows it to make a direct connection between the identity of its subscriber and that subscribers' PVI, without the consent of its subscribers and to the detriment of Plaintiffs' and class members' legally protected privacy rights.

128.     Defendants had and continue to have the choice to design the Website so that the webpage URLs did not include the titles of videos.  Defendants had, and have, the choice as to whether to purposefully include more information in the Website's URLs, including to improve website interaction and search engine optimization.[65]   Here, NASCAR chose to expose subscribers' video information so that it could benefit from the tracking and sharing of subscribers' PVI.

129.     Defendants also had the power to implement the Pixel in a way that shielded subscribers' sensitive information. NASCAR chose, however, to transmit subscribers' unencrypted PVI.[66]

130.     These factual allegations are corroborated by publicly available evidence. For instance, a subscriber visits the NASCAR site, clicks on a pre-recorded video, such as "Jessica

---

[65] *See Domains,* MOZ https://moz.com/learn/seo/domain (last visited December 20, 2023).
[66]     *See    Meta    for    Developers:    Advanced    Matching*,    FACEBOOK https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching    (last    visited December 20, 2023).

Hook details challenges of turning Next Gen car into Garage 56 entry," and subsequently watches the video.

131.    Sensitive data sent to Facebook through the triggered Facebook Pixel Events are included within the parameters of the Request URL, within the Request Header, or as a Payload within the request. The specific Pixel Events implemented by NASCAR sends subscribers' PVI through the Request URL parameters and HTTP Headers.[67]

132.    An "HTTP Header" is a field of an HTTP request or response that passes additional context and metadata about the request or response.[68] Specifically, Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize its response to the request or supply authentication credentials[69] to the server or otherwise provide more information about the client sending the request.[70]

133.    Defendants share with Facebook the specific Streaming Content requested by subscribers to the Website through Request URL parameters. This is portrayed in *Figure 9 below.*

---

[67] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited December 20, 2023).

[68] *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited December 20, 2023).

[69] *Id.*

[70] *Id.*



*Figure 9, Video Title included in URL parameters disclosed to Facebook through PageView Pixel Event on the Website*

134.    Defendants also transmit subscribers' PII to Facebook in the form of an unencrypted and unique Facebook ID number contained in the c_user cookie included in the HTTP Request Header, which can be used to find a user's personal Facebook page, as highlighted in *Figure 9* above.

135.    The information contained within the c_user cookie is considered PII. It contains "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[71]   Because the Facebook ID number can simply and easily be appended to "www.facebook.com/" to navigate to the relevant user's profile, it requires no

---

[71] *In re Nickelodeon Consumer Privacy Litigation,* 827 F.3d 262, 290 (3d Cir. 2016).

special skill or expertise to identify the user associated with the Facebook ID, and courts have regularly upheld its status as PII.[72]

136. By way of example, the following includes a pixel transmission with a c_user cookie:



*Figure 10 - List of cookies and values embedded into HTTP Request sent to Facebook by NASCAR's Pixel*

137. The string "100091959850832" can be appended to www.facebook.com/, such that www.facebook.com/100091959850832 leads directly to the Facebook user who last logged in to the browser and visited the Website.

138. Here, the result would appear, to a stranger, as depicted below:

*Figure 11 - The Facebook profile that appears when navigating to www.facebook.com/100091959850832*

---

[72] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n*, 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).

139. Defendants share subscribers' PVI via separate Facebook Pixel events, including the PageView and MicroData Pixel Events. The PageView Pixel Event triggers as soon as the Pixel is loaded onto the user's browser.[73] The MicroData event triggers whenever a webpage containing metadata tags established by NASCAR is loaded onto the user's browser.[74]

140. The PageView event's inclusion of users' PII and web watching data, including video title, is depicted above in *Figure 11 above.*

141. Microdata events are triggered whenever a web page containing Microdata tags is loaded.[75]

142. Microdata tags allow developers to embed metadata within the contents of a web page.[76]

143. This metadata includes the title and description of a video – for example, here, "title": "Jessica Hook details challenges of turning Next Gen car into Garage 56 entry"; or, "meta:description" "Corey Lajoei talks with Jessica Hook, the Garage 56 project's 'Chief of Staff,' about getting the car ready for the 25 Hours of Le Mans[]" on the Website, as depicted below *Figure 12*:

---

[73] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited December 20, 2023).
[74] *What are the Subscribedbuttonclick and MicroData events and can/should I disable this?*, FARMER'S RANDOM WEB/AD TECH PROBLEMS, Dec. 28, 2017, http://randomproblems.com/subscribedbuttonclick-microdata-events-can-disable-facebook-pixel-autoconfig-feature/ (last visited December 20, 2023).
[75] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on August 2, 2023).
[76] *Meta for Developers: Microdata Tags*, FACEBOOK https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on December 20, 2023).



*Figure 12, Microdata Event sends Microdata tag for video's title to Facebook.[77]*

144.   The Microdata Event's HTTP Headers also include the c_user cookie of the subscriber in the same transmission as the Payload. This is depicted below in *Figure 13*:



*Figure 13 - Embedded c_user cookie in Pixel Request transmitted to Facebook[78]*

---

[77] *Jessica Hook details challenges of turning Next Gen car into Garage 56 entry,* NASCAR (June 1, 2023) https://www.nascar.com/video/franchise/stacking-pennies/jessica-hook-details-challenges-of-turning-next-gen-car-into-garage-56-entry/ (last visited on December 20, 2023).
[78] *Id.*

145.    Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of subscribers' web watching data and PII (in the form of the user's Facebook UID) with Facebook.

### d.    NASCAR Was Told The Pixel Discloses Subscribers' Data; It Knew Precisely What the Pixel Would Collect and Share

146.    When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy) including PVI.[79]

147.    To make use of the Pixel, Defendants agreed to Facebook's Business Tool Terms (the "Business Terms").

148.    The Business Terms informs website owners using Facebook's tracking tools that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[80]

149.    Facebook directs parties implementing the Pixel – here, NASCAR– to encrypt request information[81] *before* data can be shared.  *Id.*

150.    Facebook further provides Pixel users, such as NASCAR, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

---

[79] *See Meta for Developers: Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited . . . .") (last visited December 20, 2023).
[80]         *Meta        Business        Tools        Terms*,        FACEBOOK https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited December 20, 2023).
[81] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent.  NASCAR has specifically chosen the Pixel method which makes users' information visible. *See Id.*

151.    Facebook educates or reminds Pixel users of their responsibility to inform subscribers to the website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[82]

152.    As a sophisticated party entering into a business arrangement with another sophisticated party, NASCAR was on notice of the potential privacy violations that would result from use of the Pixel, and ignored Facebook's warnings to safely handle its subscribers' data and to warn its subscribers that the NASCAR Website would disclose information in a manner that threatened subscribers' VPPA-protected PVI.

**E.    E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Teams and Subscribers**

153.    Visitors to the Website are prompted and encouraged to subscribe to the Website newsletter, as shown above in *Figure 1*.

154.    By signing up to the e-newsletter, subscribers are granted access to regular emailed updates and information, including pre-recorded videos or links to those videos, without having to first visit the website directly.   Subscribes are provided exclusive discounts, event promotions, ticket offers, fundraising, special event notifications, premium seating, and hospitality, along with other weekly newsletter content. Subscribing to an e-newsletter allows users to stay up to date on the latest news, race results, events, and promotions related to NASCAR. E-newsletter subscribers may also receive exclusive discounts on NASCAR tickets.[83]

---

[82] *Business Help Center: Best Practices for Privacy and Data Use for Meta Business Tools*, FACEBOOK   https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited December 20, 2023).
[83]  *Why Consumers Subscribe and Unsubscribe from Email [New Data]*, HUBSPOT, https://blog.hubspot.com/marketing/why-consumers-subscribe-to-email (last visited December 20, 2023).

155.	NASCAR benefits from the value created through its use of free e-newsletters and its subscription-based service model.

156.	In addition to driving website traffic, e-newsletters and other email marketing tactics deliver the highest and most measurable return on investment of all marketing channels.[84] Sports related email marketing fare even better.[85] Marketing through the use of email has the benefit of being trackable,[86] and e-newsletters offer website operators insight into subscribers' interests and bases for targeting subscribers for future marketing efforts.[87]

157.	With 99 percent of users checking their email daily,[88] some as much as 20 times a day,[89] it is not surprising that websites seek to engage users regularly with emails through e-newsletters.

158.	The effectiveness of NASCAR's email marketing has not gone unnoticed.  In a cross-platform promotion for a NASCAR series streamed on Facebook, Facebook noted that NASCAR drove awareness by "promoting the content through its other digital assets – email marketing campaigns and website."[90]

---

[84]	*What is the Average Email Marketing ROI?*, CONSTANT CONTACT, https://www.constantcontact.com/blog/what-is-the-roi-of-email-marketing/ (last visited December 20, 2023).

[85] *Id.*

[86] *The 7 Advantages of Having an Email Newsletter*, COMPOSE.LY, https://compose.ly/content-strategy/advantages-of-having-a-newsletter (last visited December 20, 2023).

[87] *Id.*

[88] Luisa Zhou, *Email Marketing ROI Statistics: The Ultimate List in 2023*, LUISA ZHOU, https://www.luisazhou.com/blog/email-marketing-roi-statistics/ (last visited December 20, 2023).

[89] *Conversion Rate Optimization Blog: 40+ Email Marketing Statistics You Need to Know for 2023*, OPTINMONSTER, https://optinmonster.com/email-marketing-statistics/ (last visited December 20, 2023).

[90] *Meta For Media: NASCAR and Bubba Wallace Find Marketing Formula for Facebook Watch*, FACEBOOK https://www.facebook.com/formedia/blog/nascar-and-bubba-wallace-find-marketing-formula-for-facebook-watch (last visited December 20, 2023).

159.     Overall, a user with either a newsletter subscription becomes a part of the Website's ecosystem and provides various benefits to the Website.

**F.     The NASCAR Website Newsletters Contain or Link to Videos on the NASCAR Website**

160.     The NASCAR Website newsletters contain breaking news, video access, and more, *see*, *supra*, ¶ 4, *Figure 1*, all directly linked to the Website, or to a sub-page on the Website.

161.     NASCAR newsletters include links to articles, videos, photo galleries, and race results.

162.     A screenshot of the newsletter shows that various videos are clickable through the NASCAR Newsletter, which includes play buttons near the title of the video, as depicted below:



Figure *14*, Screenshots of videos within NASCAR's Newsletter

163.     These videos, as presented only to subscribers in the newsletter, directs subscribers to a webpage on the NASCAR Website, which auto-play immediately upon reaching the Website from the newsletter.

164.     Just like all other videos on the NASCAR Websites, the NASCAR Website pages linked from the newsletters include the Pixel, and track and disclose subscribers' Private Viewing Information to Facebook within a single transmission.

### G.      Sign-up for the NASCAR Subscription Lacks Informed, Written Consent Pursuant to the VPPA

165.     The Website does not seek nor obtain permission from subscribers, including Plaintiffs and the Class, to share the subscribers' PII or web watching history with third-parties, including Facebook.

166.     The sign-up process for the Website's newsletter does not seek or obtain informed, written consent.

167.     To the extent information about any of the Website's data sharing can be located, the language is not (i) presented to users of the site in a transparent manner, or where it must be viewed by visitors to the website; (ii)  made available as part of the sign-up process; (iii) offered to users as checkbox or e-signature field, or as any form of consent; and (iv) presented in terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

### TOLLING

168.     The statutes of limitations applicable to Plaintiffs' and the Class claims were tolled by Defendants' conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

169.     As alleged above, Plaintiffs and members of the Class did not know and could not have known when they used the Website that Defendants were disclosing their information and

communications to third parties. Plaintiffs and members of the Classes could not have discovered Defendants' unlawful conduct with reasonable diligence.

170.    Defendants secretly incorporated the Facebook Pixel into the Website, providing no indication to subscribers and visitors that their communications would be disclosed to these third parties.

171.    Defendants had exclusive and superior knowledge that the tracking entities' tracking tools incorporated on its Website would disclose visitors' protected and private information and confidential communications, yet failed to disclose to visitors that by interacting with the Website that Plaintiffs' and Class Members' Video Watching Data would be disclosed to third parties.

172.    Plaintiffs and Members of the Class could not with due diligence have discovered the full scope of Defendants' conduct because the incorporation of the tracking entities' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website user that Defendants were disclosing and allowing the interception of such information to these third parties.

173.    The earliest Plaintiffs and Class Members could have known about Defendants' conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

174.     Plaintiffs bring this action individually and on behalf of the following Classes:

All persons in the United States with a subscription to the Website that had their Personal Viewing Information improperly disclosed to Facebook through the use of the Facebook Pixel (the "Class").

175.     Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

176.     Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

177.     This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

178.     Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

179.     Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, the Website to watch videos, and had their PII collected and disclosed by Defendants.

180.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.    Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

181.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

182.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a.    Whether Defendants collected Plaintiffs' and the Class's PII and Video Watching Data;

b.    Whether Defendants unlawfully disclosed and continue to disclose the PII and Video Watching Data of subscribers of the Website in violation of the VPPA;

c.    Whether Defendants' disclosures were committed knowingly; and

d.    Whether Defendants disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

183.    Information concerning Defendants' Website data sharing practices and subscription members are available from Defendants' or third-party records.

184.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

185.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

186.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

187.    Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq*.
### (On Behalf of Plaintiffs and the Class)

188.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

189.    Plaintiffs bring this count on behalf of themselves and all members of the Class.

190.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

191. "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

192. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

193. Defendants violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

194. Defendants, through the Website, engage in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Website delivers videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Website.

195. Defendants are a "video tape service providers" because they create, host, and deliver hundreds of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4)

196. Defendants solicit individuals to subscribe to the Website newsletters that advertise and promote videos and articles on the Website.

197. Plaintiffs and members of the Class are "consumers" because they subscribed to the newsletters. 18 U.S.C. § 2710(a)(1).

198. Plaintiffs and members of the Class viewed video clips on the Website.

199.    Defendants disclosed Plaintiffs' and Class Members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' and Class Members' event data, including the title of the videos they viewed.

200.    Defendants knowingly disclosed Plaintiffs' and Class Members' PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook, or any third-party is required.  Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

201.    The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

202.    Plaintiffs and members of the Class did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to Facebook.  Defendants failed to obtain "informed, written consent" from subscribers – including Plaintiffs and members of the Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

203.     Defendants' disclosure of Plaintiffs' and Class Members' Video Watching Data and PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

204.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

205.     On behalf of themselves and the Classes, Plaintiffs seek: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

Injunctive Relief Of Defendants' Ongoing VPPA Violations

206.     An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative classes they seek to represent, and Defendants, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continue to violate, Plaintiffs' and Class Members' rights to protect their PII under the VPPA.

207.     Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims, and are thus entitled to declaratory and injunctive relief.

208. Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiffs and the absent Class Members, and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

209. NASCAR completely disregards their obligation under the VPPA by loading the Facebook Pixel, onto the Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

210. Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA, Defendants did not seek or obtain any form of consent from subscribers for the use of the tracking tools to share information improperly pulled from the Website.

211. This threat of injury to Plaintiffs and members of the Class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)   For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)   For an order declaring the Defendants' conduct violates the statute referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)   Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendants to immediately (i) remove the Facebook Pixel from the Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e)   For damages in amounts to be determined by the Court and/or jury;

(f)   An award of statutory damages or penalties to the extent available;

(g)   For Defendants to pay $2,500.00 to Plaintiffs and members of the Class, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)   For pre-judgment interest on all amounts awarded;

(i)   For an order of restitution and all other forms of monetary relief;

(j)   An award of all reasonable attorneys' fees and costs; and

(k)   Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: December 21, 2023

By:  s/ David Wilkerson
David M. Wilkerson
NC State Bar No. 35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
dwilkerson@vwlawfirm.com

Scott Edelsberg*
Adam Schwartzbaum*
**EDELSBERG LAW**
20900 NE 30TH Ave #417
Aventura, FL 33180
Telephone: (786) 289-9471
Email: scott@edelsberglaw.com
Email: adam@edelsberglaw.com

Mark S. Reich*
Courtney Maccarone*
Gary S. Ishimoto*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming