# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| ANGELA MYERS, OSCAR RODRIGUEZ, PAUL SUTTON, TREVOR ADKINS, BRENT RISH, DEREK SAMMELMAN, and MARY MARTIN, on Behalf of Themselves and All Others Similarly Situated,<br><br>　　　　　Plaintiffs,<br>v.<br><br>NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC. and NASCAR DIGITAL MEDIA, LLC,<br><br>　　　　　Defendants. | **Case No.: 3:23-cv-00888-FDW-SCR**<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC AND NASCAR DIGITAL MEDIA, LLC's MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 4

    I.    Defendants Are VTSPs Under The VPPA............................................................. 4

    II.    Plaintiffs Are Consumers ....................................................................................... 7

    III.    Defendants Knowingly Disclosed Subscribers' PII............................................. 10

        A.    FID identifies a "specific person"................................................................ 10

        B.    Defendants caused Plaintiffs' browsers to disclose PII .............................. 12

        C.    Defendants knew the Pixel was Disclosing PII ........................................... 13

    IV.    The VPPA is Constitutional................................................................................. 14

CONCLUSION..................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Ade v. Viki, Inc.*,
  No. 23-cv-02161-RFL, 2024 U.S. Dist. LEXIS 79467 (N.D. Cal. Mar. 28, 2024) .................. 12

*Aldana v. Gamestop, Inc.*,
  No. 22-CV-7063-LTS, 2024 U.S. Dist. LEXIS 29496 (S.D.N.Y. Feb. 21, 2024) .............. 4, 5, 6

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004) ................................................................................................................ 10

*Buechler v. Gannett Co., Inc.*,
  No. CV 22- 1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ...................................................... 8

*Cantu v. Tapestry, Inc.*,
  No. 22-CV-1974-BAS-DDL, 2023 U.S. Dist. LEXIS 118474 (S.D. Cal. July 10, 2023) .......... 5

*Carroll v. Gen. Mills, Inc.*,
  No. CV 23-1746 DSF (MRWx), 2023 U.S. Dist. LEXIS 110049 (C.D. Cal. June 26, 2023) .... 5

*Christopherson v. Cinema Ent. Corp.*,
  No. 23-cv-3614 (JWB/LIB), 2024 U.S. Dist. LEXIS 47847 (D. Minn. Mar. 6, 2024)............. 14

*Christopherson v. Cinema Ent. Corp.*,
  No. 23-CV-3614 (JWB/LIB), 2024 WL 1120925 (D. Minn. Mar. 6, 2024) ............................. 12

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ............................................................................................. 11, 12

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ............................................................................................. 7, 8

*Frawley v. Nexstar Media Group, Inc.*,
  No. 3:23-cv-02197-L (W.D. Tex. July 22, 2024) ...................................................................... 8

*Golden v. NBCUniversal Media, LLC*,
  688 F. Supp. 3d 150 (S.D.N.Y. Aug. 23, 2023) ........................................................................ 5

*Goldstein v. Fandango Media, LLC*,
  2023 U.S. Dist. LEXIS 71415 (S.D. Fla. 2023) .................................................................. 6, 10

*Harris v. Pub. Broad. Serv.*,
  662 F. Supp. 3d 1327 (N.D. Ga. Mar. 20, 2023) .............................................................. 8, 9, 13

*Hernandez v. The Container Store, Inc.*,
  No. 2:23-cv-05067-HDV-RAO, 2024 U.S. Dist. LEXIS 2292  (C.D. Cal. Jan. 3, 2024) ........... 5

*In re Hulu Privacy Litig.*,
  No. C 11-03764 LB, 2012 U.S. Dist. LEXIS 112916 (N.D. Cal. Aug. 10, 2012) .................. 6, 7

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (2016) ................................................................................................................ 11

*In re Vizio, Inc.*,
  238 F. Supp. 3d 1204 (C.D. Cal. Mar. 2, 2017) .................................................................. 4, 5, 7

*Lebakken v. WebMD, LLC*,
  640 F. Supp. 3d 1335 (N.D. Ga. 2022) ................................................................................. 8, 9

*Li v. Georges Media Grp. LLC*,
  No. CV 23-1117, 2023 WL 7280519 (E.D. La. Nov. 2, 2023) ................................................ 13

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015) ................................................................................................. 7

*Rancourt v. Meredith Corp.*,
  No. 22-cv-10696-ADB, 2024 U.S. Dist. LEXIS 18069 (D. Mass. Feb. 1, 2024) ..................... 4

*Saunders v. Hearst TV, Inc.*,
  No. 23-cv-10998-RGS, 2024 WL 126186 (D. Mass. Jan. 11, 2024) ......................................... 8

*Sellers v. Bleacher Report, Inc.*,
  No. 23-CV-00368-SI, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ..................................... 10

*Stoudemire v. Lee Enters.*,
  No. 3:22-cv-00086-SHL-SBJ, 2023 U.S. Dist. LEXIS 185787 (S.D. Iowa July 20, 2023) ...... 11

*Yershov v. Gannett Satellite Info. Network, Inc.*,
  820 F.3d 482 (1st Cir. 2016) .................................................................................................... 7

**Statutes**

18 U.S.C. § 2710 ........................................................................................................................... 2
18 U.S.C. § 2710(a)(1) .............................................................................................................. 2, 7
18 U.S.C. § 2710(a)(3) ................................................................................................................ 10
18 U.S.C. § 2710(a)(4) .............................................................................................................. 2, 4
18 U.S.C. § 2710(b)(1) .................................................................................................................. 2
18 U.S.C. § 2710(b)(2)(B) ............................................................................................................ 2

# INTRODUCTION

National Association for Stock Car Auto Racing, Inc. ("NASCAR"), while generally known for its races across the world, recognized the importance of monetizing its races in any way it can. In years past, it was sufficient to auction off broadcasting rights to its races but, with the proliferation of content consumption on digital devices, NASCAR's Director of Revenue Operations has recognized that "monetizing across all screens is very important." Compl. ¶80.

To that end, NASCAR created its own website, www.nascar.com ("the "Website"), and staffed its own production studios to create, store, and distribute its own digital content. NASCAR views the Website as a means of monetizing fans and "tried to create a lot of those [race] experiences" on the "digital side[,]" through an advertisement-laden platform. NASCAR employs techniques aimed to improve the value of its ad space, including to increase: (i) the number of users exposed to the advertising; and (ii) the effectiveness of the advertising itself.

To improve the effectiveness of the advertising sold (or bought) by NASCAR to target its fans, NASCAR deliberately employs Meta Platforms, Inc.'s ("Meta" or "Facebook") tracking pixel ("Pixel"). The Pixel monitors users' activity on the Website, including pages visited, buttons clicked, and videos watched, then packages that information with users' Facebook profile identifier and sends the information to Meta. As a result, Meta can associate the users' activity with their Facebook accounts, building useful demographic and interest profiles on the users, allowing for advertisements to more accurately target users.

NASCAR also solicits users to subscribe to e-newsletters containing curated and exclusive content, including links to videos on the Website, in exchange for subscribers' personal information. The e-newsletters provide updates on races, articles, and analysis, all of which are linked to on the Website. The e-newsletters are a targeted gateway to access the Website, encouraging repeat visits from subscribers.

NASCAR does not inform or seek consent from its subscribers that it harvests their video media watching information and essentially sells it to advertisers. By sharing volumes of subscribers' information with third parties, including videos requested and/or watched by subscribers, without their consent, NASCAR violates the Video Privacy Protection Act ("VPPA") 18 U.S.C. § 2710. NASCAR's substantial media production and delivery apparatuses make it "a video tape service provider" ("VTSP") pursuant to the VPPA, 18 U.S.C. § 2710(a)(4). Further, Plaintiffs' subscriptions to NASCAR's e-Newsletters qualify Plaintiffs as "consumers" under the VPPA (18 U.S.C. § 2710(a)(1)), conferring protection to their "personally identifiable information" (*see* 18 U.S.C. § 2710(a)(3), (b)(1)), which was nonetheless knowingly disclosed by NASCAR to third parties, including Meta, without Plaintiffs' statutorily-required written consent (18 U.S.C. § 2710(b)(2)(B)).

For the foregoing reasons, Plaintiffs sufficiently state a claim for violation of the VPPA. Further, as the intervenor, the U.S. Government, aptly explains in its brief, the VPPA is constitutional. The Court should therefore deny Defendants' motion to dismiss ("MTD").

## STATEMENT OF FACTS

To create, stream, and monetize its digital ventures, NASCAR created the NASCAR Media Group ("NMG"), which creates and records digital content, distributes digital content to include on NASCAR's video platforms–including its websites–and stores and archives that media for later use. Compl. ¶¶ 81–90. NASCAR's subsidiary video services entity serves to support NASCAR's racing arm, which operates more than 1,000 races annually. *Id.* ¶¶ 29, 76-80.

The Complaint alleges the significant investment NASCAR has made in its video production and distribution services. Content created by NMG is distributed across multiple channels, including: broadcast television, satellite, and the Website. *Id.* ¶ 90. Recognizing the

2

Case 3:23-cv-00888-FDW-SCR    Document 26    Filed 08/16/24    Page 6 of 19

importance of its Website, yet another NASCAR entity, a subsidiary of NMG, NASCAR Digital Media ("NDM")[1], created and manages the Website. *Id.* ¶¶ 92–93.

The Website hosts and delivers pre-recorded audio-visual clips of races, highlights, interviews, and sports analysis. *Id.* ¶ 2. To solicit repeat visitors and increase the value of its advertising, NASCAR invites subscriptions to its e-Newsletters, which contain links to content on the Website, including pages with pre-recorded videos. *Id.* ¶¶ 5, 100, 155. By signing up to the e-Newsletters, users become subscribers who receive emails to exclusive content and direct links – and, in certain instances, "play" buttons – to pre-recorded video content. *Id.* ¶¶ 154, 162.

Without notifying the Website's users, NASCAR added the Pixel to each page of its Website. *Id.* ¶¶ 7–8. The Pixel tracks user activity on the Website from users' browsers (*see id.* ¶ 139), capturing information such as which webpages are visited, the titles of articles and videos being consumed by users, the summary or description of the articles, and videos being consumed by Visitors (the "Watching Data"). *Id.* ¶¶ 139-143. Users, including Plaintiffs, who were logged onto their Facebook accounts, were subjected to the surreptitious collection of their unique and unencrypted Facebook Identification Number (the "FID" or "UID"). *Id.* ¶¶111–20. The combination of FID and Watching Data (collectively, "personally identifiable information" or "PII") is then transmitted to Meta. ¶¶111–13.

Meta uses this PII to "build valuable personal profiles for users, enhance[e] marketing effectiveness and increase[e] the chance of converting users into . . . customers." *Id.* ¶ 98. NASCAR benefits from improving the effectiveness of targeted advertising. *Id.* NASCAR admits

---

[1] National Association for Stock Car Auto Racing, Inc.("NASCAR"), NASCAR Media Group ("NMG"), and Nascar Digital Media, LLC ("NDM"), collectively referred to as "Defendants."

that targeted advertising played a role in increasing "advertising inventory sales by 90% and increase[ing] programmatic fill[2] by at least 300%." *Id.*

## ARGUMENT

### I. Defendants Are VTSPs Under The VPPA.

A company "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials" is a VTSP. 18 U.S.C. § 2710(a)(4). The VTSP "engaged in the business" of delivering video materials need not be the sole party involved in delivering video,[3] and a VTSP need not only deal in video materials.[4] Courts have uniformly found that defendants who monetize pre-recorded videos, in any form, are VTSPs. *See Rancourt v. Meredith Corp.*, No. 22-cv-10696-ADB, 2024 U.S. Dist. LEXIS 18069, at *34–37 (D. Mass. Feb. 1, 2024) (finding length or medium requirements for "similar audio visual materials" was inapplicable to the VTSP analysis); *Aldana v. Gamestop, Inc.*, No. 22-CV-7063-LTS, 2024 U.S. Dist. LEXIS 29496, at *18–20 (S.D.N.Y. Feb. 21, 2024) (finding that selling a product that that contains VPPA-covered video content as well as non-covered content still qualifies a party as a VTSP).

Defendants provided the website architecture and media software needed to deliver thousands of pre-recorded videos to Plaintiffs and Class members on the Website. Compl. ¶ 59. Defendants stressed the importance of video to their business, including video production, video archiving, and video distribution capabilities (*id.* ¶¶ 81–89) and made significant financial investments specifically to its video production and delivery capabilities (*id.* ¶ 84).[5] NASCAR

---

[2] *See* Dan Hughes, *The Beginner's Guide to Programmatic Advertising*, DIGITAL MARKETING INSTITUTE (Mar. 11, 2024) https://digitalmarketinginstitute.com/blog/the-beginners-guide-to-programmatic-advertising#heading_52480 (last visited August 14, 2024).
[3] *In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. Mar. 2, 2017) ( "a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content.").
[4] *See* Senate Report 100–599 at 12 (noting hypothetical of department store VTSP selling video and non-video goods).
[5] *Facilities*, NASCAR STUDIOS, https://www.nascarstudios.com/facilities/ (last visited August 14, 2024).

touts its studios as its "centralized hub for strategy, creation and distribution of best-in-class, on-demand content."[6] Defendants profit from the advertising placed on webpages containing videos on their own Website and from selling video production and distribution services to third parties.

Video production and distribution is a distinct "focus of the [D]efendant[s'] work[.]" *In re Vizio,* 238 F. Supp. 3d , 1222 (finding a television manufacturer was a VTSP despite its main purpose of building televisions, because it "created a supporting ecosystem to seamlessly deliver video content to consumers" via streaming). Defendants contend that having multiple streams of revenue (e.g., sanctioning races, video production services, and advertising placed on video pages) prevents their VTSP status. MTD at 4–5. This contention not only belies case law,[7] it reframes the Complaint, ignoring the details relating to NASCAR's emphasis on and profits derived from video content creation and delivery. For the same reasons, Defendants' comparison cases – involving defendant fashion brands, cereal companies, or pet medicine retailers – are inapplicable. *See* MTD at 5.[8] NASCAR's video delivery is not incidental marketing; rather, it is a significant monetization source. Compl. ¶¶ 79-82. Courts have found far less to qualify as a VTSP. *See In re Vizio*, 238 F. Supp. 3d at 1222 finding TV manufacturer was VTSP for designing smart TV that provided access to streaming apps). Even cases ruling against plaintiffs have found defendants like NASCAR would constitute a VTSP. *Cf. Cantu v. Tapestry, Inc*., No. 22-CV-1974-BAS-DDL, 2023 U.S. Dist. LEXIS 118474, at *23–24 (S.D. Cal. July 10, 2023) (holding allegations of high volume of

---

[6] *Home page*, NASCAR STUDIOS, https://www.nascarstudios.com (last visited August 14, 2024) (emphasis added).
[7] *See Golden v. NBCUniversal Media,* LLC, 688 F. Supp. 3d 150, 156 (S.D.N.Y. Aug. 23, 2023) (concluding that defendant could provide news services, in addition to video, and qualify as a VTSP); *Gamestop, Inc.*, 2024 U.S. Dist. LEXIS 29496, at *19 (where defendant is in the business of selling a product that "include[s] video content that is covered by the VPPA—it can be covered by the VPPA at least to the extent of those products")
[8] *See, e.g., Hernandez v. The Container Store, Inc.*, No. 2:23-cv-05067-HDV-RAO, 2024 U.S. Dist. LEXIS 2292, at * 6–7 (C.D. Cal. Jan. 3, 2024) (plaintiffs failed to allege that container maker "sells such content or even receives remuneration" for videos); *Carroll v. Gen. Mills, Inc.*, No. CV 23-1746 DSF (MRWx), 2023 U.S. Dist. LEXIS 110049, at *9 (C.D. Cal. June 26, 2023) (plaintiffs did not allege that any aspect of the cereal maker's business was "to serve audiovisual material). These cases differ materially from NASCAR, which plaintiffs allege are paid for video content, and who are significantly tailored to produce and distribute video.

videos disseminated via the internet, breadth of video material disseminated, and creation of the videos are indicia of being a VTSP).

The "delivery" element of the VPPA is satisfied where, as detailed in the Complaint (¶¶ 59, 62–72), the Website transmits the digital content directly to users. *See In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2012 U.S. Dist. LEXIS 112916, at *14, 19 (N.D. Cal. Aug. 10, 2012) (finding "transmit[ting] digital content over the internet[,]" even without producing the content, sufficed for VTSP purposes).

Defendants, without citing to any authority, argue that the length or medium of the video affects the VTSP analysis. MTD at 6–7. Neither feature of videos affects VTSP status. *See Gamestop, Inc.*, 2024 U.S. Dist. LEXIS 29496, at *17 (collecting cases to conclude that short video clips within video games constitute "similar audio visual material"). The court in *In re Hulu*, a case relied on by Defendants, held that, "'similar audio visual materials' is about the video content, not about how that content was delivered (e.g. via the Internet . . .)."" *In re Hulu*, 2012 U.S. Dist. LEXIS 112916, at *16.

Even if VTSP status is a close call, which it is not, dismissal is not warranted. *See Goldstein v. Fandango Media, LLC*, No. 9:2022cv80569, 2023 U.S. Dist. LEXIS 71415, at *10 (S.D. Fla. 2023) (sustaining VPPA claims despite uncertainty as to the nature of defendant's business involvement in renting, selling or delivery of audiovisual materials). The *Goldstein* court reasoned that "the Court must [first] determine the nature of Defendant's business," explaining that this determination involved analyzing "how much business Defendant devotes to each of" its business goals. *Id.* at 10. In accordance with *Goldstein*, the Court should find that Plaintiffs have alleged sufficient facts to show that Defendants are VTSPs based on the nature of their business.

## II. Plaintiffs Are Consumers

Accepting Plaintiffs' allegations as true and construing them favorably for Plaintiffs, the Court should find Plaintiffs to be consumers under the VPPA. Courts observe that the VPPA is construed broadly so that its protections "retain their force even as technologies evolve[.]" *In re Hulu* 2012 U.S. Dist. LEXIS 112916, at *19.[9]

The VPPA defines a "consumer" as a "subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). The circuit courts of appeal have distinguished between individuals who are not subscribers, because they merely visited a website or downloaded an app, and those who are, because they took actions such as to "sign up for or establish an account[,]" "provide any personal information[,]" "become a registered user[,]" or "sign up for any periodic services or transmissions," among other things. *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (explaining that subscriptions involve a variety of factors, including "payment, registration, commitment, delivery, [associated expression,] and/or access to restricted content"); *see Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (holding that plaintiff qualified as a subscriber where he downloaded and used a free mobile application that provided the defendant media company with the plaintiff's location, device identifier, and videos titles watched by plaintiff in return for use of defendant's app). The *Yershov* Court reasoned that although the plaintiff did not pay money for defendant's application, he provided consideration in the form of access to his personal information, forming a subscriber relationship. 820 F.3d at 489.

---

[9] *See also Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) ("Consistent with Congress's purpose, the [VPPA's] language is broad."); *In re Vizio*, 238 F. Supp. 3d, at 1225(observing that "'portions' of the legislative history suggested a broader interpretation" of language under the VPPA) (citation omitted).

Defendants claim a person subscribing to "a free email newsletter," without a corresponding rental, purchase, or subscription "to audiovisual goods or services", is not a "consumer" under the VPPA. MTD at 3–4. Notably, none of the cases Defendants rely upon were decided in this Circuit. And federal district courts hold an individual is a "consumer" if, like Plaintiffs, they allegedly gave consideration to a VTSP in the form of personal information in exchange for its services. *See, e.g., Saunders v. Hearst Television, Inc.*, No. 23-cv-10998-RGS, 2024 WL 126186, at *3 (D. Mass. Jan. 11, 2024) (finding allegations that plaintiff provided their email address and enabled geolocation services and push notification in exchange for right to use defendant's mobile app was "adequate consideration … to obtain subscriber status under the VPPA"); *Buechler v. Gannett Co., Inc.*, No. CV 22-1464, 2023 WL 6389447, at *2 (D. Del. Oct. 2, 2023) (subscription to a newspaper's newsletter provided "access to articles and video content … plausibly implies that [] newsletter is a good or service within the scope of the VPPA" and, therefore, plaintiff who signed up for that newsletter was a "consumer"); *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1332 (N.D. Ga. Mar. 20, 2023) (finding subscriber status attained through account registration, providing personal information, including name, address, email, IP address and cookies); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335 (N.D. Ga. 2022) (finding plaintiff, who exchanged her email address to receive the WebMD e-newsletter, was a subscriber under the VPPA") (citing *Ellis*, 803 F.3d at 1256); *see also Frawley v. Nexstar Media Group, Inc.*, No. 3:23-cv-02197-L, ECF No. 27, at 8, 12 (W.D. Tex. July 22, 2024) (denying motion to dismiss where plaintiff "provided personal information in exchange for a subscription to 'a digital newsletter'"). Applying these holdings, the Court should conclude that Plaintiffs have sufficiently plead allegations to support consumer status under the VPPA.

Defendants urge this Court to dismiss the Complaint based on a line of district court cases holding that a "subscriber" under the VPPA must be a "subscriber of audio-visual [materials], and

8

not good or services writ large." *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 98 (S.D.N.Y. 2023). *Carter*—and the cases cited in the Motion that apply its reasoning (*see* MTD at 3-4)—distinguish between subscribers to a company's videos and those who subscribe to a newsletter that does not provide access to or enhance the company's videos. *Id*. The Court should decline to follow these cases because they (i) ignore the standard of review on a motion to dismiss, and (ii) misconstrue the VPPA's plain language, contrary to principles of statutory construction and controlling law.

The Court should not impose an extra-textual requirement that "subscription" be to "audio visual goods or services." *See Lebakken*, 640 F. Supp. 3d at 1341 ("goods or services . . . is generally construed broadly to encompass 'all parts of the economic output of society'"). The *Harris* court explained that "the VPPA requires only a subscription to any goods or services, not to goods or services related to video." 662 F. Supp. 3d, at 1333. Conversely, *Carter* errs by inserting words into the VPPA statute that do not appear there in violation of fundamental rules of statutory construction. In doing so, *Carter* renders key provisions of the VPPA as surplusage.

*Carter* presumes that because a VTSP is the source of the "goods or services" obtained by "consumers," an action can only be brought "by a renter, purchaser of subscriber of audio visual materials, and not a broader category of consumers." *Carter*, 670 F. Supp. 3d at 99.



Figure 1 - Carter's textual analysis, visualized

9

Under the *Carter* reasoning, the word "video" becomes unnecessary in the definition of PII.[10] According to *Carter*, the "video materials or services" in 2710(a)(3) must already be limited to "videos" because they are obtained from a VTSP (*see Carter*, 670 F. Supp. 3d at 99), improperly3d at 99), making use of "video" surplusage in the statutory language. Conversely, the plain language of the statute states that "any . . . subscriber" to the "goods or services" of a "video tape service provider" has a cause of action if their "personally identifiable information" is disclosed to a third party without their consent—regardless of whether the "good or services" relate to "audio visual materials." *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[Congress] says in a statute what it means and means in a statute what it says there."). The Court should conclude Plaintiffs sufficiently allege they are each a "consumer" under the VPPA because Defendants' newsletter is plausibly one of its "goods or services."[11]

### III. Defendants Knowingly Disclosed Subscribers' PII

The "knowingly" standard under the VPPA is satisfied when a VTSP implements the Pixel on websites. *See Sellers v. Bleacher Report, Inc.*, No. 23-cv-00368-SI, 2023 WL 4850180, at *5 (N.D. Cal. July 28, 2023) (finding the "knowingly" element satisfied where defendant "deliberately installed the Facebook pixel on its website"). As alleged, Defendants had actual knowledge through its employment of the Pixel on the Website.

#### A. FID identifies a "specific person"

PII encompasses "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

---

[10] PII is "information which identifies a person as having requested or obtained specific **video materials or services** from a video tape service provider[.]" 18 U.S.C. § 2710(a)(3) (emphasis added).
[11] *See Goldstein*, 2023 U.S. Dist. LEXIS 71415, at *10-11 (denying motion to dismiss VPPA claim based on argument that plaintiff was not a consumer because the court did not yet "have a factual record upon which to rely regarding Defendant's business").

Courts have held that "identif[ying] a [specific] person" under the VPPA is met by the transmission of FID and Watching Data. *See Yershov,* 820 F.3d at 486 (defining PII as "information reasonably and foreseeably likely to reveal" user and video); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 289–90 (3d Cir. 2016) (stating PII means "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching"); *Stoudemire v. Lee Enters.*, No. 3:22-cv-00086-SHL-SBJ, 2023 U.S. Dist. LEXIS 185787, at *14 (S.D. Iowa July 20, 2023) (following *Yershov*); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (following *Nickelodeon*).

Defendants' argument that the FID does not identify a specific person is underscored by an unsupported presumption: that the "ordinary person" test applies in this Circuit. MTD at 6–9. NASCAR then misapplies the test, claiming it relates to the ability to use and gather information, and that identifying a specific individual with an FID should require little to no effort or experience.

First, the "ordinary person" standard makes little sense when there is evidence that "Facebook actually uses [p]laintiffs' [PII] to shape the advertising Plaintiffs' receive. *See Lee Enters*, 2023 U.S. Dist. LEXIS 185787 at *17.

Second, *Edwards v. Learfield Commc'ns, LLC*, relied on by Defendants (MTD at 8–10), is the only court to require plaintiffs to explain how Facebook accesses metadata; why doing so does not require technical expertise; or how much metadata must be combed through to discover users' PII. No. 1:23-cv-00065, 2023 U.S. Dist. LEXIS 222315, at *18–19 (N.D. Fla. Oct. 6, 2023). The holdings *In re Nickelodeon* and *Eichenberger*,[12] however, only applied the "ordinary person" standard to using PII, rather than to gathering the PII. *See In re Nickelodeon*, 827 F.3d at 290

---

[12] Both cases involved internet tracking, and cited by the *Edwards* court.

(finding PII refers to "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior"); *Eichenberger*, 876 F.3d at 986 ("an ordinary person could not use the information that [d]efendant allegedly disclosed").

Third, while Defendants contest whether the FID identifies a specific person, none of the cases they rely on support their position. In fact, quite the opposite: "[a] Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Eichenberger*, 876 F.3d at 986. The *Edwards* court, in contrast, was concerned with the ease of obtaining the PII, rather than the ease of using the user's FID to identify the user's Facebook profile. 2023 U.S. Dist. LEXIS 222315, at *17–19; *see also Ade v. Viki, Inc.*, No. 3:23-cv-0126102161-RFL, 2024 U.S. Dist. LEXIS 79467, at *4–5 (N.D. Cal. Mar. 28, 2024) (finding FID was PII because "an individual can allegedly be identified based solely on their unique FID").

As alleged, Defendants sent Meta users' FID (*see, e.g.,* Compl. ¶¶ 112, 117–18, 133–36) and Watching Data (*see, e.g., id.* ¶¶ 133, 143). Since "[a] Facebook UID can be used, by anyone, to easily identify a Facebook user … by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here])" (*id.* ¶ 120), the FID sufficiently identifies a "specific person."

### B. Defendants caused Plaintiffs' browsers to disclose PII

The Pixel, as placed by Defendants on its Website, gathers and bundles the FID with Watching Data before transmitting both to Meta. *Id.* ¶ 112. Plaintiffs are not to blame for the transmission of their PII, as Defendants propose (MTD at 10–11). The c_user cookie is not the cause either. *Id*. Defendants' argument is not novel and has been rejected. *See Christopherson v. Cinema Ent. Corp.*, No. 0:23-cv-03614,CV-3614 (JWB/LIB), 2024 WL 1120925, at *5 (D. Minn. Mar. 6, 2024) (denying efforts to blame plaintiff's browser as the cause of the Pixel' harm, adding that "it appears that the Courts which have considered this argument have either rejected it or

12

determined that it is a factual argument unsuitable for consideration at the motion to dismiss stage").

Defendants misconstrue Plaintiffs' allegations about the c_user cookie, claiming it is the mechanism for transmitting a subscriber's profile. *Compare* MTD at 11 (claiming Plaintiffs allege "the c_user cookie on his own computer transmits his FID to Facebook") *with* Compl. ¶¶ 98–101, 121, 126–29, 131, 133–36, 144 (alleging the Pixel was added by Defendants to the Website, and the Pixel caused PII to be disclosed to Meta). Indeed, "it is not Plaintiff's FID – contained in the cookie – that establishes liability under the VPPA. Rather it is the bundling of the FID … with the URLs of the videos Plaintiff watched that matters." *Harris,* 662 F. Supp. 3d at 1334.

### C. Defendants knew the Pixel was Disclosing PII

Defendants' business entails targeted marketing, retargeting, and other forms of monetizing or improving website traffic through digital tracking. *See* Compl. ¶¶ 81–85, 91; MTD at 5 (NASCAR's "digital marketing"). Defendants used tracking tools, including the Pixel, for its business and advertising. *See* Compl. ¶¶ 81–85, 91. What's more, Defendants agreed to Meta's Business Tools Terms, which explicitly warn Pixel-users (like NASCAR) about the tool's collection and sharing functionality. *See id.* ¶¶ 146–52. NASCAR's alleged knowledge exceeds the pleading requirements for VPPA claims. *See, e.g., Saunders,* No. 23-CV-10998-RGS, 2024 WL 126186, at *4 (finding VPPA claim adequately pled where complaint is "rife with allegations that [defendant] knew that it was collecting data from users"); *Li v. Georges Media Grp. LLC*, No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 2, 2023) (sustaining similar "knowingly" allegations, regardless of which standard of "knowledge" applied).

Plaintiffs adequately alleged that: (i) FID identifies Facebook profiles; (ii) Plaintiffs did not cause the transmission of their own PII; (iii) subscribers did not consent to the transmission of

13

PII (nor were they given the opportunity); and (iv) Defendants were aware of the transmissions. This suffices at the pleading stage.

## IV. The VPPA is Constitutional

The VPPA has consistently survived first amendment scrutiny. *See Christopherson v. Cinema Ent. Corp.*, No. 23-cv-3614 (JWB/LIB), 2024 U.S. Dist. LEXIS 47847, at *13 (D. Minn. Mar. 6, 2024) (noting courts have unanimously rejected unconstitutional vagueness and first amendment challenges to the VPPA, or reserved decision until after discovery); *see also* ECF No. 22-1 (the U.S. Government's brief for constitutionality in this action). Plaintiffs respectfully suggest that the Government's brief on this issue demonstrates why Defendants' arguments are incorrect and should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied. Should the Court grant the Motion in any part, Plaintiffs respectfully request leave to amend.

Dated: August 16, 2023

Respectfully submitted,

By: *s/ David M. Wilkerson*
David M. Wilkerson
NC State Bar No. 35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
dwilkerson@vwlawfirm.com

Mark S. Reich*
Courtney Maccarone*
Gary S. Ishimoto*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com

Email: gishimoto@zlk.com

Scott Edelsberg*
Adam Schwartzbaum*
**EDELSBERG LAW**
20900 NE 30TH Ave #417
Aventura, FL 33180
Telephone: (786) 289-9471
Email: scott@edelsberglaw.com
Email: adam@edelsberglaw.com

*Counsel for Plaintiffs*
**pro hac vice* forthcoming

# CERTIFICATION OF WORD COUNT

I hereby certify, subject to Rule 11, that the foregoing Plaintiffs' Response in Opposition to Defendants National Association for Stock Car Auto Racing, LLC and Nascar Digital Media, LLC's Motion to Dismiss Plaintiffs' Complaint does not exceed 4,500 words exclusive of case caption, table of contents, table of authorities and certifications of counsel.

*/s/ David M. Wilkerson*
David M. Wilkerson

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically filed on August 16, 2024 with the Clerk of Court using the CM/ECF system, which will automatically send an email notification of such filing to all attorneys of record.

*s/ David M. Wilkerson*
David M. Wilkerson